May it please the Court, Plaintiffs are not entitled to injunctive relief because they failed to meet their heavy burden of proving the three elements of constitutional culpability, causation, and class-wide harm. First, as to culpability, the District Court contravened Supreme Court and Circuit precedent by effectively constitutionalizing best practices and by substituting a negligent standard for the stringent due process liability standard of deliberate indifference to a substantial risk of serious harm. Second, as to causation, the District Court improperly presumed that plaintiffs' harms are directly caused by defendants' policies as opposed to the horrific abuse and neglect that plaintiffs suffered before entering foster care. And third, the District Court erroneously found class-wide harm by embracing a risk of being at risk theory that the Supreme Court has rejected by ignoring evidence that Texas generally satisfies the federal government's demanding standards for safety and permanency in foster care and by extrapolating the patently atypical experiences of 12 hand-picked named plaintiffs to the entire class of 12,000 PMC children. So are you still pressing the class issue here? The class certification issue, Your Honor? Yes. We are. We have made that point, but we believe that the Court likely need not reach it because after the trial on the merits with all the evidence on the table, the same failings, instead of reviewing under the abuse of discretion standard for certification, the Court can simply look at the evidence and see that, for example — I don't suggest that we're in the validity of the class in any event, don't I? I'm sorry, Judge Higginbotham? That your observation sort of validates the existence of the class, that we need not do that if it's not on the merits. But to go ahead. I heard you. Well, of course, we can appeal certification at this point, and we have. But like I said, it's not moot exactly, but the fact that the Court can review all the evidence means — I understand your position. Thank you. I'll start, if I may, with the largest issue in the case, that of caseworker caseloads. It is hardly conscience-shocking for a State not to adopt caseworker caseload caps based on aspirational best practice standards that other States do not follow. The Federal Government does not require, and even the District Court recognized, are not constitutional minima. I mean, because it strikes me that those caseloads are sort of like our caseloads. There are cases that are easy to determine and cases that are more difficult. Setting a flat number just doesn't seem to make any sense as far as I can see. That's exactly right, Judge Smith. And not only are the cases different, the caseworkers themselves have — some have more experience, some have less. Some can take on heavier loads, and some may have, for example, a caseload of very basic needs — children who don't need as much attention can take a much heavier caseload than a caseworker who has a caseload consisting of higher-needs children. Doesn't it also matter in terms of — and Texas has some geographic areas where just the travel distances would indicate that it would make a large number of caseloads more difficult to handle, but if they're all in a local area, they might be a lot easier. That is also true, and that is the very reason that the Legislature pushed DFPS a number of years ago to adopt the — what we call the ICU Secondary Caseworker Program, where we have — because children sometimes need to be moved out of their county, for example, to a specialized treatment facility, everyone agrees you cannot have residential treatment facilities, these kind of specialized facilities in all of — You don't think there's anything wrong with a caseload? You don't think there's anything wrong with a caseload of district court's findings? That's not correct. Let me clarify your question. Are you saying do we disagree with the court's facts? Well, you can't keep caseworkers down there. If you look at the numbers, what happens is they last maybe a year, a half percentage of them fall out the first year. It is constant turnover. In fact, the people that are in permanent management will only see a caseworker a couple of times a year at best. And then you have the CU category, which is a fill-in for caseworkers just to go in and check in to see that the child is still there. So you have children going through that for years and seeing a caseworker two to three times, and they move multiple times from different places. Your Honor, to — I don't understand your assertion that the casework load is not — that seems to be the — one of the large difficulties here. And to be clear, we are not saying that caseloads are not a problem. We are not saying that some caseworkers are not overloaded. They are. We have worked very hard to bring caseworker caseloads down, and we recognize the very problems Your Honor is talking about. What have they done to bring down the caseload? They've hired additional caseworkers. They've also had a number of steps that have been implemented to retain caseworkers because, as you point out, the problem is not just that, you know, we can hire caseworkers, but if we don't keep them, that's also a problem. Well, they don't keep them because in the findings of the district court, they're so — they're stretched so thin that they give up. And this is not exactly an energetic — it's a tough, tough work for anybody. I think everybody would agree to that. But that turnover rate is because you're giving — according to the district court's findings, is because you're giving them far more work than they could do meaningfully. But again, Your Honor, the due process standard is not are some caseworkers overworked? The due process standard is — The question is whether or not when you take a child into custody, you have — you expose them to an unreasonable risk of harm. Now, even a pretrial prisoner is entitled to very much the same standard. But a child who is not there voluntarily becomes a custodian of the state because you've terminated their parental rights. Then you owe that constitutional duty. And that's — so our question is, is this an unreasonable risk of harm? Your Honor, I disagree with the — for liability under due process, and the district court acknowledged it and plaintiffs acknowledged it, they have to show deliberate indifference to a substantial risk of serious harm. And I don't see how anyone can say that we're deliberately indifferent to the caseload issue. All states struggle with caseloads. It's a very difficult job to do. And it's an emotionally draining job. And a lot of people do leave after a shorter period of time because they just can't do the work. It takes a very special person to be a caseworker. And Texas is not unique in that regard. Practically speaking — As I look at your numbers, this is a perpetuating system. Oh, I'm sorry. As I look at this, what you have coming into the system, like you have 23,000 kids, but then you have — as they go from the temporary to the permanent, that reduces. But then when they come out at age 18, you have like 47 percent of the females come out of there are pregnant in the first year, and a high percentage of those come right back into the system again. Let me be clear about that. The 47 percent statistic, Your Honor, is not 47 percent of the people. It is the — I mean, it's the — when you look at the age-out population, it's 47 percent of children, of females who are aging out. But plaintiffs did not say that Texas is out of line with other states in terms of the number of people who age out. All states have that problem. And you may have a correlation in terms of children who age out of the population. I mean, it may be that — what I'm suggesting to you is that this system is also almost self-perpetuating because you have a significant number of people who are coming back into the system who are the children of people who have come through the system. And every state, Your Honor, I would say has that problem. I understand that. Let's talk about this one for a moment. They — do you agree with that? There certainly — there is some number of children who have that. But the question is, is it our policies and practices that are causing that, or is it because there are preexisting abuse and neglect? And the way to look at that is, as the plaintiffs acknowledged, you can do a study of a random representative. Preexisting abuse and neglect. The people we're describing it have been for years — the children have been for years in your system. And they have been seen by caseworkers only a handful of times. So if it's self-perpetuating, it's happening while they're in your system. Your Honor, I disagree that the evidence in this case shows that these children are being seen by caseworkers only a handful of times. And if the system were true — Well, let's talk about that data. The data — I'm sorry, but as I read the data, I'm wrong. I thought that when you move to the permanent category management, that they're aging out during that period of time, that many of — that those children only see a caseworker at a maximum of two or three times a year. Your Honor, they see the caseworker once a month. All children do, whether they're in TMC or in PMC. And let me just point out that if it were true, as the — Wait a minute. A caseworker or this — The ICU worker? I'd like to see if you're their worker. It doesn't matter. The ICU worker is taking the place. Perhaps it doesn't matter, but when you say caseworker, are you saying both caseworkers and also a worker — I forget the — The ICU? The ICUs, yes. ICUs. By the very definition, as I read this record, what they do is to go to confirm that the child is still there. Your Honor, that is a — there was — some people characterize it as that's all they're doing, but there was also testimony in the record from plaintiff's own witnesses that the ICU workers spend an hour with children. That was in the testimony, for example, of Sandra Carpenter. But let me make a quick point to get — that goes directly to your question. An hour, and then they see them four times at best a year. Once a month. ICU caseworkers are seeing them once a month, or they're required to see them once a month, just like the regular caseworkers are. The point is, if this were really true, as plaintiffs allege and the district court claimed, that this was this completely Dickensian system where nothing was going right and caseworkers were so overwhelmed they couldn't do anything, how is it possible that Texas would be satisfying the federal government's rigorous standards, ambitious national standards for maltreatment and permanency in foster care? Now, I know they claim that the statistics for the maltreatment, they say, well, you know, we manipulate those somehow. That's not true. But even if it were, that doesn't explain how we're doing so well on the permanency system. Do you keep track of child-on-child abuse? We do keep track of it, but not in the centralized method that the district court — Don't report it. I'm sorry? Don't report it. It is captured in this way, Judge Clement. When we're looking at — when RCCL is going out to investigate an incident of child — of reported abuse in a licensed facility, what they're looking to do is to see, has the facility done something wrong? And so they're looking to see, obviously, did one of the caregivers themselves, were they abusing the child, if that's what was reported, or were they negligent in their supervision of the children in their care? Because that's the only way — if something happened where they weren't negligent, then that may not get recorded in terms of abuse and neglect statistics, but it does get recorded in the files of the individual children, both in their common application and in the files that the CPA, that the Child Placing Agency, maintains. But it doesn't reflect anything against the institution, right? If there was not a finding made of neglectful supervision, then that is correct. How could there not be a finding of neglectful supervision if you're having child-on-child abuse within the facility? Because there are — the way that that would happen, for example, sometimes children have reported to be sexually aggressive or otherwise require heightened supervision contractually that the caregiver is required to, for example, if they have a lack of impulse control or something like that. When they're admitted, you mean? Correct, when they're admitted. It's a known problem. If it's a known problem and it's in their record, and then if something happens at night, for example, then they would be neglectful for having failed to monitor the child. But if there's no indication of that in the record, then effectively you're just holding the facility strictly liable just because kids, unfortunately, the reality is, sometimes do engage in some problematic conduct, particularly if they have been themselves — they call it sexualized by prior abuse. And that's an unfortunate reality. But, again, that happens in every state. That's a problem. And I don't think that there's a practical solution to that. I mean, the district court has suggested, well, everyone should have their own individualized placement in a single home. But, again, you can't make people be foster parents, and you can't— How are these numbers ever going to work out if you're hiring more caseworkers but you're also taking in more foster children? How is it ever going to be resolved? I know you've gotten millions of dollars from the state legislature. And that's a problem that Texas has been dealing with, which is that we do go out and we work hard to solve the problem. We ask for more money from the legislature. They give us money when they have it. We have great programs to try to retain more caseworkers. But then more kids come into the system. And the reality is, with the demographics, Texas has one of the highest child poverty rates in the country. We are responsible for most of the child growth in the country over the last decade. And so, basically, the question is, remember, it's the deliberate indifference standard. It's not are there problems that— Well, 25% to 30% of the kids that age out of your foster system go back into extended foster care, so you don't have a problem. Well, Your Honor, the fact that we make extended foster care available to them after 18, I think is a good thing. I mean, we wish that not every child needed to do that. But the fact that we're not just cutting everyone loose at age 18, as the plaintiff suggests, we have a variety of programs, including extended foster care. We have a program of sort of supervised independent living that foster children can participate in after they've technically aged out of the system and other things that they can do up to age 21 and sometimes beyond, precisely because we do care deeply about these children. We recognize that the long-stay children, the children that have had the most difficulty in obtaining permanency through satisfactory placements, they do need help. And we do our very best to give them that help. But the question is, are our actions so arbitrary to satisfy that really tough, stringent, substantive due process standard? And I just don't think how anyone can look at these defendants. For example, the main defendant in this case at the time of trial was former Commissioner Specia. And everybody, the plaintiffs and witnesses, the district court said, Mr. Specia is a wonderful man. He's dedicated his entire career, professional career, to protecting children. He's done everything that anybody possibly could. You're not going to read anything bad about what he's done. But that's what, at the end, the district court had to say, well, I guess somebody had to be deliberately different. It must be him. But the district court at the same time recognized that Commissioner Specia and his staff have the best intentions of running an effective foster care system. The district court did make some specific comments claiming that the state was unresponsive and uncooperative. You probably need to respond to those. I would love to respond to that, Judge Smith. What the district court said in its final injunction, well, let me take a step back. In its 2015 order, the district court ordered Texas to establish and implement policies and procedures to address these problems. And we tried to appeal that order, and this court said no, that's really not on the table yet because it's the special masters who are going to advise the district court, and the district court is going to tell you what those policies and procedures are. Everyone agreed about that. And then in its final order, the district court came back and said, well, we're being recalcitrant because since 2015 we have not been working to establish those policies and procedures that everyone told us. We had to wait for the special masters to tell us what they were through the orders of the district court. And so I just don't see, I mean, the district court said on the record in its order we were cooperating wonderfully with the special masters. They said the parties, that means us, have made tremendous accomplishments in what we were working to do in terms of improving the system. And then we're surprised to find out when the final order comes out that somehow we've been said to have been uncooperative all along when nobody said a word about that. The final order being March of 2018. Was it March of 2018? January of 2018. January of 2018. Correct. So there was a gap between December of 15 and January of 18. Correct. And I would urge you, Judge Smith, to look at our reply in support of our stay motion. We addressed this very point because plaintiffs tried to pick up this argument from the district court and say, ah-ha, you weren't complying with what they called the anticipated remedies, meaning you weren't doing what the district court hadn't yet already told you to do, which I'm not aware of any case law that says we have to comply with orders that are not effective yet. And even the plaintiffs themselves recognized that the only order that was effective prior to the final order was that awake night supervision order, a very narrow order that this court had confirmed in its, I believe, 2015 when we tried to take that appeal. And the court said that's the only thing that's really live at that point. And we said, okay, we're going to pull down our appeal and we will comply with that awake night supervision order. And we did. Did the plaintiffs object to the interlocutory appeal of December? They argued that the court did not have jurisdiction to hear it, and the court essentially agreed with them for the most part and said most of this stuff is not yet live. I'm not sure if that answers your question. Let me, one question. The DFPS received nearly a billion dollars in additional funding from the legislature in the last session. Can you help us a little bit of how that money is being dispensed? What problem here has been addressed by that funding? There's a lot of different things that that money is going to. Focus on caseworkers. A lot of it, a big chunk of it, in both this session and in the last session, DFPS obtained from the legislature large amounts of money to hire additional caseworkers, and they have done that. They have brought the case loads down. They have been below 20 children per caseworker since the time of trial in the last year or two. I think they've been at 19 or 18. And really, I mean, when the district court is saying – Let me ask you another question. Yes. Is any of the money being directed to the records systems? You have an impact system and another system, and they don't talk to each other. One system records data about the children and other data, and the caseworkers can't access it. It sounds to me like you have some aging records systems there. Is any money going to those? Yes. Commissioner Specia testified to this about you've got $25 million. This was at the time of trial. He had requested that in the 2013 legislative session. He got another $25 million, I believe, in the next session. I see I'm out of time, if I may answer Your Honor's question. To do what with? To upgrade the impact system and to improve the way it's able to store information and allow caseworkers to enter it more easily and reduce paperwork and those kind of things. So, yes, improvements are being made on that front. All right. Thank you, Mr. Hughes. You've saved time for rebuttal. Thank you. Mr. Getter. Thank you, Your Honor. May it please the Court. At trial, the then commissioner of the department admitted, quote, if you don't define, measure, and evaluate a problem, you can't fix it. Here, one of the core issues is that the state knows the chronic safety risks in its system, yet consistently has chosen not even to measure them and has never fixed them. For example, Judge Clement, you asked about child-on-child abuse. The state refuses to track child-on-child abuse. So as of today, the state could not tell you which placements have more incidents of child-on-child abuse, which areas of the state. They simply refuse to do that. Thus, the trial judge in the trial in 2014 repeatedly urged the state, why don't you track this? And here we are, four years later, they still don't track it. Judge Higginbotham, you asked about case loads. One of the main problems that the state has had this for decades, and what the state said and what the evidence was at trial, is that the state had refused to do a workload study for case workers so that they knew how many children they could handle. Now, after the verdict for the liability in 2015, in 2016 the state actually did a case worker workload study, and the trial court mentioned this in her remedy order. What the state found is that case workers can physically handle up to 14 children, on average, across the system. So that was a remedy phase piece of evidence, but it is absolutely consistent with what the liability phase of this case showed, is that case workers are chronically overburdened in the state. So, Judge Smith, to get to one of the points that you made about case loads being different for different children, this case was not about individual children or individual placements. This was a case about a system, the Texas child welfare system, and we, on behalf of the plaintiff's children, followed this court's certification order, both in moving for certification of the case, and the trial judge below followed faithfully this court's rulings on legal liability for these kind of cases, both in Hernandez and in Griffith, and this court, again, reaffirmed them in its 2016 order on denying the stay. And those two cases, Hernandez and Griffith, of the Fifth Circuit, said that foster children have the constitutional right to personal security. The state has taken them into custody, and these children have a constitutional right for the state to make sure they have personal security and reasonably safe living conditions. That's exactly the legal standard that the trial court followed. She repeated it. The court repeated it many times in her liability. What in the district court's order, remedy order is going to respond to the difficulties of the case load? I'm sorry? What in the, if the district court's remedial track is followed and pursued, what will it do in addressing the difficulties of attending caseload workers? One of the key points. I think no one disputes that it's a difficult job and enormous turnover, et cetera, et cetera, and that's also one of the core issues in the case. It is indeed, Judge Higginbotham. One of the remedies that was ordered below was caseload standards or caps. And while the state objects that it is completely out of the court's authority to do that, in fact what the state points out is the Connor B case in Massachusetts is so similar, and in that case the district court and the first circuit denied relief. But, in fact, in Connor B they had caseload standards and caseload caps. So what the district court in this case has ordered is, in fact, something that when you have a chronically overburdened understaffed system can make sense. Now, what the district court didn't do is it didn't rush to judgment on remedy. This was a two-phase process. We had a two-week, 40-witness trial on liability. And then the district court, we believe, using classic restraint by a district court, waited and invited more, appointed two special masters and invited more input by experts and by the state itself. And one of the things that we believe the district court pointed out and bothered the district court below was that when the court was looking at remedies and invited the state to provide input on how best do we fix what is an admitted problem overworked caseworkers, understaffed system has been around for at least 20 years, Judge Higginbotham. And the state, while it provided data and the district court lauded the state for cooperating on providing data, what the state refused to do over and over again, and the district court points this out in her order, is provide solutions for a potential remedy. And the district court said this is without prejudice. We're not saying you're waiving anything, but we're trying to find the best remedy for caseworkers. So with the district court, one of the solutions was caseworkers. When you're setting caseloads, that's just overly mechanistic, it seems to me. The focus should be on the results, not on particular numbers. I'm thinking of, by analogy, cases that we have on prison medical care where the standard is also deliberate indifference. The standard isn't how many patients a doctor is supposed to see. The question is whether the inmates are getting adequate medical care at the end of the process. So when the district court sets these limits on the placement arrays and the foster group homes and sets a maximum number of case files per worker, maybe that looks good on paper, but it has little to do, as far as I can see, with the result, which is adequate safety, which is what you said was the standard. Yes, Judge Smith. Two points. Let me add. Yes. I have quite the same concern. How do you tie the caseload deficits to unreasonable harm in a constitutional sense? Two points. To answer Judge Smith first, Judge Smith's question highlights that the court has two issues here. Liability, which we proved through showing the deprivation an unsafe system that was known and the state was consciously indifferent, and the appropriate remedy, and that is subject to a matter of abuse of discretion for the district judge. The district judge heard input from lots of sources, including outside experts, recognized child welfare experts, and looked at national standards in coming up with the remedy. The district court did not make up these remedies itself. The district court looked at what other states and what national states looked to, and Judge Higginbottom, yes, the remedy has to tie to the constitutional violation. These are not separable inquiries. I understand remedy and liability, yes, but this question of the connection between the caseload itself and unreasonable risk of harm is the core of the case. It's not that we find that some kind of deficit. You have to have that before you get to a remedy phase, and that will almost dictate what the remedy is. Yes, sir. But my question is what shows that accepting all of your assertions of deficits with regard to the caseworker that the district court found, what ties that to unreasonable risk of harm? How does that present an unreasonable risk of harm to the children? Yes, Judge Higginbottom, the evidence in the case, as we would all expect, was that caseworkers were the responsible, primary caseworkers, were the responsible adult to keep track of foster children and keep them safe. They were called critical and crucial, the bedrock, the lifeline, the district court said. Caseworkers, and this is a poor analogy, but in a prison system, what keeps the prisoners safe from each other are the guards, and if you have inadequate staffing like in Brown v. Plata, you will have disarray and physical harm and other harm in a prison. In a foster care system, what keeps the children safe, undisputed testimony, are the caseworkers, the primary caseworkers. Safe from what? Safe. Abuse of other inmates or what else? Safe from physical, sexual, and psychological harm. So in the foster care system... How do we know what that is? Because one of your other concerns has been the want of accurate data with regard to how much abuse goes on. Your inspection system showed up 74%, 75% error rate with regard to the reporting of abuse. So my question is, what do we know about that? That doesn't mean that they're... Does that mean that they're 74% too low or inaccurate? Two things, Judge. One, every witness in the case testified that having caseworkers that are chronically overburdened puts children at risk, safety risk. And, in fact, the Texas Appleseed 2010 study of the system, which is an independent study, said almost every stakeholder interviewed for that study, this is 2010, just a few years before the trial, said that caseworkers in the Texas system are so overworked they can't do their jobs. Their primary job is to keep the children safe. On the investigation, Judge Higginbotham, what the evidence was at trial is there was a 75% error rate. Alone, that would be concerning. These are supposed to investigate reports of abuse, physical, sexual abuse, or negligent care by caregivers. But what the district court found is they underreported... Error rate, what does he mean by that? All right, very quickly. The state has a system of investigators that are supposed to check every report of abuse, a child, a teacher. Somebody reports abuse of a foster child. The state also has a group within itself that does audits of those investigations. And what we found was shortly before trial, just a couple years before trial, that audit group looked at a section, all of the physical abuse investigations that resulted in a certain finding of unable to determine. And the state's own section said 65% of those were wrong. That means some should not have been unable to determine, some should have been that abuse actually occurred, and some should have been that abuse did not occur. So they fundamentally, 65% were wrong. This is internally within the state. The state then did another audit of the same information and more information. And this second audit was done by the head of this investigative unit at the state. Again, all this is within the state, not something that the plaintiffs did. The second audit turned out that the error rate was actually higher. It was 75% because they actually looked at both physical abuse investigations, sexual abuse investigations, and negligent care investigations. And so, Judge Higginbotham, what it means is if you don't have a system, a foster care system in which reports of abuse, physical or sexual abuse, which is the safety issue that we're talking about here, are not properly investigated, you cannot then take remedial action. You may, and in this case, that's exactly what happened. Eleven children actually, they determined in the audit, had been sexually, had been physically abused and nothing was done about it in the first study. And then in the second one, eight had been physically or sexually abused and nothing was done about it. And what the district court was perhaps most upset with, which reflects directly to conscious indifference, deliberate indifference, is that with these findings of this tremendously inaccurate investigation process, the same investigators, using the same flawed process, were coming to a category of unable to determine. What the state did next was even worse, because the state then didn't look at the 90% of determinations that they do, which rules out abuse. So one of the state's own expert witnesses said at trial, 90% ruling out abuse in 90% of the reports is very troubling to me. She said, I think it raised questions with me. Other witnesses said, whereas the state rules out 90% in Texas, other states typically maybe 60% to 70%. All right, so let me ask you a question. You're saying deliberate indifference. Are you contending, basically, that it's not really deliberate indifference, it's deliberate failing to report? In other words, if the state reports all this terrible bad behavior by an institution, you know what's going to happen. Somebody's going to close down the foster home, the institution. So all of a sudden, everybody's going to be reported for bad work, and they're going to be shut down, so there are not going to be places to send these foster children. People don't want to be caseworkers. I don't blame them. So is that what you think is happening? Judge Clement, we believe deliberate indifference is akin to willful blindness or a heightened... I'm asking you whether it's something higher than that, if it's an effort not to close them down by failing to report. And I actually think, Judge Clement, you put your finger on a lot of this. These defects in the system are interrelated. They're not separate defects. Because what you just highlighted, Judge Clement, is that one of the things the state does when they do find a violation in a facility is the state almost, the evidence was at trial, almost never enforces it. It almost never penalizes the facility. So what we found in 6,000 violations right before trial, and one of the, I believe it was 2013, right before trial, 6,000 violations, the state issued only 12 corrective actions. That's something like putting someone on probation, 12 out of 6,000, and one more decisive penalty like a revocation of a license, 6,000. And the reason, Judge Clement, as you just said, is the state has such a defective placement array, so many gaps in its placement, that we believe, although they did not admit this at trial, that we believe one of the problems is the state simply is saying we can't properly enforce our findings of violation because we then may lose facilities. And what then the Sunset Commission, again, not in the litigation, outside the litigation, shortly before the trial, what the Sunset Commission found is that sort of conduct promotes more violations, and that there was a 79 percent, I believe the number, 79 percent recidivism rate for residential facilities in the state because they perceive that they're not going to be held accountable. So all of these defects, respectfully, come together in kind of a perfect storm of constitutional harm for these children because the state, by knowing the problem but refusing to measure it and never fixing it, is allowing these children to go into a system. We're not talking about homes, specific homes for specific children. The children as a whole are going into a system that is unsafe for them because there's not proper investigations, there's no follow-up, inadequate staffing, the caseworkers are completely overburdened, and there's huge gaps in the placements because the state is not, in fact, the state has never even studied one of the pieces of evidence at trial. The state has never even studied what placements the children need. So as the then commissioner said, if you don't measure, you can't fix. And what the state knows is that they have a huge placement problem, and yet they've never done a placement needs study. The district court pointed this out in her liability finding and the remedy finding. She's going to order it. But the placement study tells you across the state where do we need facilities. And by not studying, we believe that's substantial proof of conscious indifference. If you consciously, willfully turned a blind eye to known chronic problems over decades, that's conscious indifference. This case, we proved, we believe, we presented this case to the district court and the district court addressed it in the traditional three-step approach. Deprivation, was there a deprivation of a constitutional harm? And there's only one set of constitutional rights, personal security and reasonably safe living conditions. Number two, was there culpability, deliberate indifference? The district court didn't adopt the lower culpability standard of departure from professional standards. The district court looked at the more stringent standard of deliberate indifference and found, frankly, sadly, substantial evidence of that. And then in a second step went to remedy. And in the remedy phase, the district court decided liability only on the trial record. In the remedy phase, as I mentioned earlier, the district court invited more information. Some pieces of the information the district court got on remedy were very telling. In the meantime, after the verdict and before the remedy order, between 2015 and 2018, the state's own top officials were telling the legislature, we have a crisis. We have a crisis in foster care that has been at least a decade in the making. The then commissioner, the new commissioner, said he was shocked. One of the standards is shock the conscience. The new commissioner said he was shocked to see how overburdened. You mean Charles Smith, is that? No, Commissioner Whitman. All right. Commissioner Whitman, all right. Yes. He said he was shocked to see how overburdened the caseworkers were. He says we are outnumbered in our state, the caseworkers are outnumbered in our state, by child abuse. What the district court then did on the remedy phase is, we believe, a very prudent step of bringing in, rather than try to figure something out on the district court's staff abolition alone, is bring in recognized experts, special masters. Francis McGovern and Kevin Ryan, a recognized child welfare expert, who has been appointed to help reform child welfare systems in other parts of the country, and solicited their input, had them do more studies, had the state do more studies. Do you support every single item in the injunction? Is every single one of them necessary in order to achieve constitutional standards? A district court faced with a system with such chronic problems has a difficult choice, Judge Smith, in crafting a remedy. And we believe the district court below, with lots of input, and frankly, we wish, with one exception, the state's own input, the district court crafted, while it's a detailed remedy order, a workable remedy order. The district court, the state is not saying it's too expensive today. In fact, the state is promoting that they have many hundreds of millions of more dollars, which the district court said may well pay for all of the remedies. It just seems to me that the injunction is really unnecessarily cluttered with things that aren't necessary, which makes it a lot harder to focus on the things that are, at least from our perspective. I'll give you an extreme example, which is the requirement of driver's education for kids that are aging out. They may be a perfectly good best practice, but how can that possibly be mixed in with requirements of constitutional standards? We are not suggesting that, and it wasn't the district court's burden to order remedies that were constitutionally required. The district court is entitled under this court's precedent and the Supreme Court's precedent, once it finds a constitutional harm, which it did, in the remedy phase, to order remedies to address the harm that may be beyond what the Constitution specifically requires. The driver's education, Judge Smith, is really related to this issue, and Judge Higginbotham pointed out about children aging out. Thirteen to fourteen hundred children every year age out of this system. These are children that were part of this class, age out of this system, and are sent into the world. What the district court found and what the evidence was is they are completely unprepared to function on their own. In fact, what the state does is one of the studies was the children that had been in for three years or longer before they aged out had had six different placements. They've had countless different placements. But what does this have to do with safety and personal security, which you mentioned earlier are the basic concerns? You're exactly right, Judge Smith. It is a concern, but the children are being put at risk. The state is putting the children at risk by sending them into the world completely unprepared, without even the ability to drive. They have no driver's license. They have no functional skills. They don't know how to take care of themselves. And so what the evidence was at trial- Well, they've gone to school. They've gotten one of the various layers of high school diploma or GED or something like that. Most of them, in fact, one of the state's trial experts said that children that age out of the Texas foster care system are at much higher rates of alcoholism, drug abuse, incarceration, unwanted early pregnancy. As Judge Higginbotham said, 49% of the young girls, these are girls 18 years old, they are pregnant before their 19th birthday. 70% of the children of these young girls that are pregnant before their 19th birthday go back into foster care. And so, Judge Smith, it would be nice in an ideal world to think that in Texas the children come out with an education. In fact, they don't. They're moved around so often that they don't have any sort of an education. And these children, simply what the district court found, is the children that age out- You're overstating it, and you don't need to overstate it maybe to prevail on some of your points. It is not true that they get no education, and it's not true that they age out totally unprepared. You know that that's an overstatement. It may be that the state hasn't done everything that it should or could have done under difficult circumstances, but it just seems to me your credibility is high here, but you undermine it by making absolutist statements like that that you know the record doesn't support. Judge Smith, I do not mean to overstate the record. There were witnesses at the trial, and there was evidence, including from this trial expert of the state, Jane Burstein. Before she became a state employee, that said that children that age out do have these at a much higher rate. They're more prone to incarceration and the other things I said. There is evidence in the record, Judge Smith. One piece of data that you don't allude to is the Casey Family Program study shows that the kids that age out have five times the rate of the general population of post-stress syndrome. That's twice the rate of combat veterans. In another way, the kids that come out of here have a five times greater chance of suffering from post-stress syndrome than do combat veterans. It is, and I, Judge Smith, I do not mean to overstate the record. I'm just describing a phenomenon. The record was very significantly impactful on these children, especially the children that age out. One state study early on was done, I believe, by another state comptroller. Let me ask you a different, let me ask you, what do you think is the, this may be somewhat unfair questions, but we get to ask unfair questions. What is the two single most important remedies that should come out of this case? If you had to choose only two, what would be the two that you would point to? I know you say they're integrated, but what would be number one? Well, number one is an easy answer, Judge Higginbotham. Case load. Case workers are tremendously overburdened. What's two? Case standards and case caps would be number one. I'm sorry? Case standards and case caps would be the most important remedy. The state does not cap the workload, caseload of any worker. And they don't even have standards for the caseloads. And there are no standards. In fact, the head, the executive at the state in charge of making sure that case workers have adequate or not excessive caseloads, she said, I don't even keep track of what professional standards are around the country. I don't know that much about that. And we've quoted that in her brief. That's a very hard question, Judge Higginbotham, on what would be number two. Foster group homes, they are dangerous places. Foster group homes. This question has to be asked because of the breadth of the injunction that is there. We have to look very carefully. I hear you, Judge Higginbotham. Do we deal with certain parts of it? Yes. But then what about these other parts? Licensing and – It's not a zero-sum game. I understand, Judge Higginbotham. Oversight and monitoring is another key issue. This dealt with investigations and enforcing violations. This should – sounds like there should be an easy remedy. If you just get enough investigators and have a process that they do it right and so that their investigations are reliable, and then you enforce your findings of violations so you don't encourage repeat violations, we believe that would tremendously help improve the safety of the system. You mentioned the foster group homes. You're talking about foster group homes with how many children? This is a unique-to-Texas institution, and what they basically did is take foster family homes that can have up to six children, combined biological or adoptive children with foster children, no more than six, with a foster family parent or two, and they supersized it. And in Texas, they said because of the lack of placements – again, these are interrelated issues – because of the lack of placements, they said we're going to make these group homes. We're going to call these foster group homes. But they didn't add to the rules or regulations or add any significant material training or any other of the safeguards that group homes have. How many adults have to be there? How many children in a foster home? Twelve, with this caveat, Judge Smith. And how many adults? It could be one or two, depending on how many children are in there. It's one or two for six. When you get to 12, it's still one or two? But the big issue, another big issue, Judge Clement, is while there's 12 foster children, Judge Smith, the policies of the state say you have to count the biological or adoptive children in the family as well, and the state doesn't. And the evidence of trial was so that you have foster group homes that can have 12 foster children and any number of adoptive or biological children. So the same one to two parents, depending on how many are in the foster group home, are literally watching over an indeterminate number of children. We did. One of the things the state has taken us to task for is we didn't do a case read, which is a generic tool to find out what the problems are. What we did is a narrow investigative data read. And, for example, on foster group homes, we had our expert look at data for all the children at foster group homes for a three-year period, 2012, 13, 14. And our expert looked at all of the investigative reports for foster group homes in 2012. So it wasn't self-selected. And what she found were that these were investigative reports of abuse in foster group homes, some 70 different cases. And what she found time and again is the state either ruled out any abuse, mistakenly, erroneously, or that the abuse, physical or sexual abuse that occurred, could have been prevented or mitigated by just simple precautions that a group home would have had. So I don't mean to overstate, over-focus on foster group homes, but they are a dangerous place for these children. And that was why the district court's first order was that. To get back to your question, Judge Higginbotham, monitoring and oversight is very important. The placement array is a difficult problem. We acknowledge that. It is not impossible. Other states have taken steps to fix it. The first step in this case that we think is an easy step for the state to do is to do a study of what the children's placement needs are. Again, as the Commissioner said, if you don't measure it, you can't fix it. And so one of the big, key pieces of evidence of indifference is they're not even trying to understand what the problem is. Thank you. Thank you, Mr. Yetter. And the Court's grateful to you and your firm for taking on this case. You've done an extremely fine job with it. Mr. Hughes, you save time for rebuttal. Thank you, Your Honor. What do those two adults pay for these group foster homes? Your Honor, I don't know off the top of my head, but I can certainly get that information for you. And I may ask if my counsel knows that, I'll ask if they can research that while I'm up here and hopefully get you an answer right now. And if we can't, we can try to submit that for you. Like you would know. And I apologize. A couple points about foster group homes. One is the foster group home study that Ms. Richter did, she admitted this under cross-examination. Her foster group home study was based on a group of foster group homes that were investigated for abuse and neglect. And when she was confronted with the fact that this was a biased study, her answer was literally, it wasn't meant to be unbiased. That's what she said. And she said, well, it was meant to confirm my preexisting conceptions about foster group homes. Her testimony on this was pure ipsy-dixit. They don't like the line drawing that the legislature has done in terms of the size of the group home. They say, for example, that they want the 24-hour supervision that our legislature has decided should start at 13. What's the explanation for the very high failures to maintain the sibling connections and breaking up these children? No one would quarrel with the fact that it's more than ideal. It's very important to keep the siblings together. And as I read the data, there was an awful lot of separation of siblings, and according to the district court, unnecessarily so. I don't quite understand that. That doesn't strike me as being unnecessary. I don't know how you explain that other than somebody just not being attentive. A couple points on that, Judge Shiginbarton. First of all, the district court's comparison on that, she looked at one other state and said that our rate of sibling separation was higher than a single other state's. And if you look at the rate of sibling separation. What is it in Texas? I'm sorry? What is it in Texas? I think the rate was, and we have this in our brief, 81%, I believe, at least two siblings are kept together out of a group, and I think 64% of all siblings are kept together in Texas. In 64% of sibling groups, all siblings are kept together. 30% aren't. And that begs the question of, so your question was, why is that happening? And the plaintiffs in the district court could tell you because they didn't look at any individual circumstances, and it was undisputed at trial by both the plaintiffs' experts and the district court. They recognized that there are instances in which it is in a child's best interest to be placed out of their home county. Not 30% of them, surely. But then the question is, what is the number? And if you don't look at any individual cases and they can't tell you. I would think that it would be, it strikes me as being rather obvious, that it would be the unusual situation in which you would separate them. If there are such circumstances, I suspect there may be. And, again, our policy is to keep them together whenever it's possible. And if they want to complain. I understand that's a policy, but what I'm suggesting to you is, according to the district court, that policy is failing miserably. But the district court doesn't know whether it's failing miserably if it has no idea whether the sibling separations are occurring for good reasons or not for good reasons. Why wouldn't they know, because you don't have the data? Because the plaintiffs failed to examine any individual cases. If they had looked, if they had done a case study and wanted to criticize, for example, and say, well, we're going to take a random representative sample and look at these children and see why they were separated from their siblings and then criticize and say, we can see that in 80% there wasn't a good reason, that would be fine. That's what plaintiffs have done in all of these other class action cases. In Connor B., in Cassie M., Baby Neal, Kenny A., Marisol A., all these other cases, a random representative sample of children's case files where they did a case reading on and then they were able to look and make determinations of, are these problems being caused by the policy or is it something else? Because everyone acknowledges it's really hard to run a foster care system. You're dealing with, and counsel mentioned, Commissioner Whitman's comment, that our caseworkers are up against the enemy of these mounting problems. I mean, there's a lot of drug use out there, and these children are coming into our care. They're worse off than they used to be. Texas has what's called a very low removal rate, and so when children come into our system, they're in worse shape compared to kids in other systems. It's a hard thing to do. I would point out that in Connor B., counsel mentioned that he said there were caseload caps in Connor B. It's because in Connor B., the state, that was the result of a collective bargaining agreement. It wasn't something that was judicially imposed on the state. The state had decided to do it for itself. That's fine. If the state wants to impose caseload caps, great. But our state and the vast majority of others don't think it's a great idea, and the due process clause doesn't require it. And I would say it's undisputed. If you look at the data about the Massachusetts foster care system in Connor B., they were at the absolute bottom of the barrel in just about every statistic. Texas, if you look at our CFSR results, yeah, we're not the best maybe, but we do pretty well. And if we're satisfying the federal government with their demanding national standards for performance, it shouldn't be the case that a district court can come along and just say, well, I choose to disagree with that. Even if the federal government's happy with you, I'm going to say your system is terrible and I'm going to take it over. Mr. Yetter says that in Texas these children age out with absolutely no preparation for independent living as adults aged 18 and over. What does the record reflect on that in your view? What the record reflects, Your Honor, is that all children upon turning age 16 that are in the PMC receive these preparation for adult living classes, or they are offered them. 20 percent, take it. You offer a program, but the problem is a small percentage of people sign up for it. I don't know why that's true. And I don't know why that is either. Without a caseworker or without somebody there giving them some counseling, they don't know what's good for themselves. The children have a strong incentive. We offer them financial incentives if they complete the program to help them transition to adult living. They can get tuition waivers if they want to go to college. We absolutely encourage children to take these preparation for adult living classes, and unfortunately some children, the reality is, don't make great decisions, and it's hard to tell a teenager if they really don't want to do some. It's hard to make them do it. Do you offer any technical school training via plumber or electrician or something like that? What would be available to them? We don't offer it separately, but if they have it available to them through their educational system in high school or something like that, they could have that. They attend local schools. Exactly. Judge Smith, you pointed this out. As you just said, but as I understand it, in Texas, after aging out, they get zero tuition, completely free tuition at any state or community-supported school, community college, state university, whatever. That's exactly right. Two percent of them take it up. Judge Higginbotham, I will get back. I think the percentage is . . . Three percent. These aren't college-bound kids for them to go through this system. Look, stop for a moment. The legislature has put out a huge amount of money here. This is a social phenomenon. I don't suggest the courts necessarily answer this, and I don't have an answer to it either, but stop for a moment and look at this thing as a machine that goes of itself. If money would solve it, you'd go about ahead and spend the money in front instead of picking up these kids, coming back into the criminal justice system, and feeding back into the same system. But a substantial percentage of your intake are just sort of almost a genetic flow right back in. That's the overall picture that is presented here. The legislature appears to be throwing some money at it to their credit. The real problem here is translating this into a system and making it better. We're the instruments only in a small way in that. We can't run the institution. Apparently no one else can either. This is a problem for every state, Judge Higginbotham. I agree with you about these circular systems and the problem, but everybody's trying to deal with this and trying to do it in different ways. And we get criticized. The district court criticized us for trying to be innovative. For example, with our foster care redesign, the district court said, well, that's not a program other states have, so therefore you're deliberately indifferent. I don't take a lot of comfort in that. When I think about the general public has no idea that we have 27,000, 28,000 kids here in the custody. On the federal side, we've got 120,000 illegal children unaccompanied there and an indeterminate sentencing program. At TYC, aging out to age 18, we've got another few thousand. That's a huge number of children in the custody of government and the state. That's a reality. And so I don't mean that in any way. It's just the context in which this occurs. And my question is, is there some magic bullet? Is there some easy solution that we're not doing that some other state is doing? I would encourage your honors to look, for example, Dr. Miller and some of the other experts on the plaintiff's side who worked in Kentucky and Tennessee. If you look at the CSFR numbers, they said we did all these wonderful things, and I agree. I'm sure they made great improvements in the systems. But look at the data the federal government is measuring them on that's in the record. Texas does better than those states on some measures, particularly on permanency, and we do worse on them on some measures. You're certainly not going to see that they're blowing us out of the water, even though they've adopted caseload caps. Let me ask you a yes or no question. Is the reason that Texas doesn't put the caps on the caseload because it would eliminate a considerable number of students who would not have the opportunity to have a caseworker if there's a cap? If the caseworker can only have 12 and that leaves out 20 more kids in that area, is that why you're not announcing caps? Can I say something other than yes or no, Judge Coleman? Okay. Part of it is that if you can't control the number of kids that are coming into the system, to draw a hard cap is pretty impractical because what are you going to do? Are you going to just say no to that kid who needs care? The other part of it is we just think it's not a very looking at caps, just a rigid caseworker cap or the number of kids per caseworker. It's a very crude metric, and it doesn't take into account individual abilities of the caseworker, and it doesn't take into account the situation of the kids that may have, if you're in TMC, the temporary conservatorship, if they have families and the caseworker is dealing with their families, that's something you should account for. Okay, I take that as a yes. Thank you. Thank you. What does the record tell us about are the caseworker visits monthly, or how often are they? They're required to be monthly, I believe, and we don't make it 100% of the time, but I think the record says it's about 95% of the time. And we do use the ICU workers to help us accomplish that requirement, but, again, there's nothing wrong with that policy choice. That's either a caseworker or an ICU. And, Your Honor, the testimony in the record was they compared them to, I think Dr. Carter said, well, they're like substitute teachers. Well, yeah, but do people say substitute teachers aren't teachers? I mean, they're meeting with the kids. They're checking on them. They're asking questions. You know, if the federal government is happy with what we're doing, we don't think it should be up to a district coach. The ICU, if I understand the record, is far different from a caseworker. And they kind of fill in and do that, but as I read this record, they're really coming up and validating the person's there and they're checking off the four questions they asked, and they're there in less than an hour with the typical presentation. That's not a caseworker. That's just somebody covering to make sure you're still accounting for people. Again, that problem, if you have anecdotal testimony of one person saying, well, they only do this, I mean, to invalidate the entire system based on a little bit of anecdotal testimony when they failed to do a case read of a random representative sample we think is grossly improper. Thank you. We'd ask the Court to vacate the adjournment. Thank you, Mr. Hughes. Your case is under submission.